[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-11050

_____

D.C. Docket  No. 8:09-cv-01755-SDM-AEP

ST. LUKE'S CATARACT AND LASER INSTITUTE, P.A.,

Intervenor Plaintiff - Appellant,

versus

ZURICH AMERICAN INSURANCE COMPANY,
a New York corporation,
MARYLAND CASUALTY COMPANY,
a Maryland corporation,
ASSURANCE COMPANY OF AMERICA,
a New York corporation,

Defendants - Appellees.

_____

No. 11-11051

_____

D.C. Docket  No. 8:09-cv-01755-SDM-AEP

JAMES C. SANDERSON,

                                        Plaintiff - Appellant,

ST. LUKE'S CATARACT AND LASER
INSTITUTE, P.A.,

                                        Intervenor Plaintiff,


                    versus


ZURICH AMERICAN INSURANCE COMPANY,
a New York corporation,
MARYLAND CASUALTY COMPANY,
a Maryland corporation,
ASSURANCE COMPANY OF AMERICA,
a New York corporation,

                                        Defendants - Appellees.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(February 7, 2013)

Before HULL, MARCUS and HILL, Circuit Judges.


PER CURIAM:

        Appellants St. Luke's Cataract and Laser Institute, P.A. and Dr. James C.

Sanderson appeal the district court's order granting summary judgment in favor of

Zurich American Insurance Company, Maryland Casualty Company, and

2

Assurance Company of America on Sanderson's breach of contract claim.  For the following reasons, we shall reverse the summary judgment and remand for further proceedings.

I.

St. Luke's Cataract and Laser Institute, P.A. ("St. Luke's"), a privately owned eye care clinic and ambulatory surgery center, employed Dr. James C. Sanderson as an oculoplastic surgeon.  In 1995, Sanderson started St. Luke's oculoplastic surgery practice, which was called the St. Luke's Cosmetic Laser Center.  In 1998, Sanderson worked with St. Luke's webmaster, Mark Erickson, to create a website to promote St. Luke's oculoplastic surgery practice.  Erickson registered the domain names LASERSPECIALIST.com and LASEREYELID.com to use for the website.[1]  These websites contained information about St. Luke's, Sanderson's education and training, and the surgical procedures that Sanderson performed; before and after photographs of patients; surgical videos; and other information for prospective patients.  Each page of the website contained a copyright notice stating "Copyright © [Year] St. Luke's Cosmetic Laser Center, All Rights Reserved."

---

[1]  The two websites contained the same information and will be referred to as LASERSPECIALIST.com

3

About five years later, Sanderson resigned from St. Luke's and opened his

own oculoplastic surgery practice.[2]  Sanderson relaunched the

LASERSPECIALIST.com website using the LASERSPECIALIST.com and

LASEREYELID.com domain names.  The website content was virtually identical

to the content of the site created by Sanderson and Erickson for St. Luke's.  The

copyright disclaimer, however, had been changed to state that the website was

copyrighted by Sanderson, not St. Luke's.

Some time after Sanderson resigned, St. Luke's realized that Sanderson was

using the domain names and website content for his private practice.  St. Luke's

applied to register a copyright in its LASERSPECIALIST.com website, and in

January 2006 the Copyright Office registered St. Luke's copyright in the February

2003 version of the website.[3]

Shortly thereafter, St. Luke's filed a complaint against Sanderson ("St.

Luke's I").  The amended complaint alleged, *inter alia*, that Sanderson infringed

St. Luke's copyright in the LASERSPECIALIST.com website, in violation of the

Copyright Act, 17 U.S.C. § 501(a) and also that he removed St. Luke's copyright

---

[2]  The name of the practice is James C. Sanderson M.D., LLC.  Sanderson and the
practice will be referred to as "Sanderson."

[3] St. Luke's later registered the June 2000 version of the LASERSPECIALIST.com
website as well.

notice from the LASERSPECIALIST.com website, in violation of the Digital

Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1202(b).[4]

Sanderson sought coverage and a defense under his liability insurance

policies with Zurich American Insurance Company, Maryland Casualty Company,

and Assurance Company of America (the "Insurance Companies").  Each of the

policies provided identical coverage to Sanderson for "advertising injury liability"

defined as injury that arises out of, among other things, copyright infringement in

the insured's advertisement.  In response to his request to the Insurance

Companies for a defense, Sanderson received a letter from Assurance Company of

America ("Assurance") that discussed the policy, coverage, and exclusions; raised

potential coverage defenses; reserved the right to deny coverage; and assigned

counsel to defend Sanderson.

After a three-week trial, the jury returned a verdict in favor of St. Luke's on

all of its claims except for the copyright infringement claim.  Although the jury

found that Sanderson infringed St. Luke's copyright, the jury also found that St.

---

[4]  The amended complaint also alleged that Sanderson infringed St. Luke's
LASERSPECIALIST.com service mark, in violation of the Lanham Act, 15 U.S.C. § 1125(a);
committed cyberpiracy by registering and using the LASERSPECIALIST.com and
LASEREYELID.com domain names, in violation of the Anticybersquatting Consumer Protection
Act, 15 U.S.C. § 1125(d); violated the Florida Deceptive and Unfair Trade Practices Act
("FDUTPA"), Fla. Stat. § 501.201-213; participated in unfair competition under Florida common
law; and misappropriated and converted St. Luke's domain names under Florida common law.

Luke's copyright registrations were invalid.  The district court entered judgment for Sanderson on St. Luke's copyright infringement claim.  Both Sanderson and St. Luke's appealed.  We affirmed the judgment.  *St. Luke's Cataract & Laser Inst., P.A. v. Sanderson*, 573 F.3d 1186 (11th Cir. 2009).

In February 2008, St. Luke's filed a revised copyright registration on the LASERSPECIALIST.com website and then filed a new, one-count lawsuit against Sanderson seeking to recover on the copyright claim ("St. Luke's II").  Assurance sent a letter stating that it would provide Sanderson a defense in this second case as well, but reserved its right to deny coverage, noting that the copyright infringement claim might be excluded from coverage under the unauthorized use exclusion or other provisions.

In August 2009, Sanderson discharged counsel provided to him by the Insurance Companies and obtained substitute counsel.  Sanderson attempted to mediate the copyright infringement claim and requested the Insurance Companies' attendance.  The Insurance Companies did not settle the claim.  Sanderson and St. Luke's subsequently entered into an agreement resolving both the judgment in St. Luke's I and the copyright infringement claim in St. Luke's II for a $2.4 million final judgment against Sanderson.

On August 26, 2009, Sanderson and St. Luke's (as the assignee of

6

Sanderson's claim) brought this action against the Insurance Companies, alleging

breach of contract by wrongful denial of coverage and failure to indemnify

Sanderson.[5]   The Insurance Companies moved for summary judgment, arguing

that although the policies may provide coverage for copyright infringement,[6] such

claims are not covered when they:

> Aris[e] out of the unauthorized use of another's name or product in
> your e-mail address, domain name or metatag, or any other similar
> tactics to mislead another's potential customers.

The district court agreed, holding that this "unauthorized use exclusion"

eliminates Sanderson's coverage for St. Luke's copyright claims against him.   This

appeal followed.

---

[5]  Plaintiffs also alleged that the Insurance Companies failed to provide a mutually agreeable defense; failed to settle St. Luke's claims against Sanderson; failed to satisfy the judgments against Sanderson; and failed to post a supersedeas bond when the first suit was on appeal.

[6]  Specifically, the policies provided coverage for "those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury,'" defined as injury "arising out of" any one or more listed offenses, including "[i]nfringing upon another's copyright, trade dress or slogan in your 'advertisement.'" This is the basis for Sanderson's claim for coverage.

However, the policies contained a number of exclusions from "personal and advertising injury" coverage.  Exclusion 12 excluded coverage for personal and advertising injuries "[a]rising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights," although this exclusion specifically did not apply "to infringement, in your 'advertisement,' of copyright, trade dress or slogan."  Exclusion 13, which is at issue in this case, also excluded certain advertising injuries as stated above.

II.

We review the district court's grant of summary judgment *de novo.*

*Holloman v. Mail-Well Corp.*, 443 F.3d 832, 836 (11th Cir. 2006).  The

interpretation of a provision in an insurance contract is a question of law that is

also reviewed de novo.  *James River Ins. Co. v. Ground Down Eng'g, Inc.*, 540

F.3d 1270, 1274 (11th Cir. 2008).

The issue before us is whether the district court erred in holding that St.

Luke's copyright infringement and DMCA claims against Sanderson, which were

based on Sanderson's use of the content of a website owned by St. Luke's, were

excluded from coverage under the policies' unauthorized use exclusion.[7]  The

district court reasoned that "each of [St. Luke's claims] arises from Sanderson's

unauthorized use of the St. Luke's domain name [or other similar tactic] to mislead

. . . potential St. Luke's customers."  Since the unauthorized use of another's

domain name is excluded from coverage under the policies, the district court

concluded that there was no coverage under the policies.  We disagree.

As an initial matter, the parties agree that Florida law governs this contract.

Thus, "[o]ur objective is to determine the issues of state law as we believe the

---

[7]  The plaintiffs also assert that summary judgment was prematurely entered in this case
because the Insurance Companies "have refused to provide any discovery in this matter."  This
matter is mooted by our holding in this case.

Florida Supreme Court would." *State Farm Fire & Cas. Co. v. Steinberg*, 393

F.3d 1226, 1231 (11th Cir. 2004).  This court looks first to the Florida Supreme

Court's decisions and, "in the absence of definitive guidance . . . , we follow

relevant decisions of Florida's intermediate appellate courts." *Id.*  Under Florida

law, insurance contract interpretation is a matter of law, and such "contracts are

construed in accordance with the plain language of the policy as bargained for by

the parties." *Fayad v. Clarendon Nat'l Ins. Co.*, 899 So. 2d 1082, 1086 (Fla.

2005) (internal quotation marks and alteration omitted).

   If the language "is susceptible to two reasonable interpretations, one

providing coverage and the other excluding coverage, the policy is considered

ambiguous," and "ambiguous exclusionary clauses are construed even more

strictly against the insurer than coverage clauses." *Id.* (internal quotation marks

omitted).  However, "an ambiguity is not invariably present when a contract

requires interpretation." *Gas Kwick, Inc. v. United Pac. Ins. Co.*, 58 F.3d 1536,

1539 (11th Cir. 1995); *accord State Farm Mut. Auto. Ins. Co. v. Pridgen*, 498 So.

2d 1245, 1248 (Fla. 1986) ("[E]xclusionary provisions which are ambiguous or

otherwise susceptible to more than one meaning must be construed in favor of the

insured. . . . However, only when a genuine inconsistency, uncertainty, or

ambiguity in meaning remains after resort to the ordinary rules of construction is

9

the rule apposite." (internal quotation marks and alteration omitted)); *State Farm Fire & Cas. Co. v. Metro. Dade Cnty.*, 639 So. 2d 63, 66 (Fla. 3d DCA 1994) ("The fact that an insurance policy requires analysis to comprehend its scope does not mean it is ambiguous.").

After applying ordinary rules of construction to the policies at issue in this case, we hold that the relevant provisions are unambiguous and cover appellants' claims.  We address each of appellants' claims in turn.

1.    *Whether Sanderson's copyright infringement constituted the "unauthorized use of another's name or product in your e-mail address, domain name or metatag"?*

The insurance policies exclude coverage for any claim that "arises out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers."  The district court erred in concluding that coverage for St. Luke's copyright claims is excluded by this provision.

First, St. Luke's copyright claim is based on Sanderson's wrongful use of the contents, layout, and design of St. Luke's LASERSPECIALIST.com website. This use of the website's content, however, is not the same thing as the use of "another's name or product."  Furthermore, Sanderson used the content for display on his own website, rather than in an "e-mail address, domain name or metatag."

10

Therefore, the copyright infringement claim against Sanderson does not itself allege "the unauthorized use of another's name or product in your e-mail address, domain name or metatag."

Nor does this copyright infringement constitute a "similar tactic" within the meaning of the unauthorized use exclusion. The exclusion enumerates three specific places in which a name or product might be used without authorization: an email address, a domain name, or a metatag. The three enumerated locations are very specific; a website is not included among them. Furthermore, if the exclusion were meant to include websites generally, it would be odd to enumerate two constituent elements of a website (its domain name and metatags) but neglect to mention the website itself. To conclude otherwise would allow the "similar tactics" language to swallow the narrow language used in the exclusion and turn it into a catch-all exclusion for the use on the internet in any way of material belonging to another.[8]

Similarly, the exclusion discusses the use of another's "name or product," not any material belonging to another. Reading "similar tactics" to extend "name

---

[8] Applying the rule of *ejusdem generis*, the Florida Supreme Court has cautioned against allowing such generic catch-alls in insurance policy exclusions to swallow their more specific antecedents. *See Fayad*, 899 So. 2d at 1088-89 ("Distilled to its essence, this rule provides that where general words follow an enumeration of specific words, the general words are construed as applying to the same kind or class as those that are specifically mentioned.").

or product" to "any protected material" would go well beyond the narrow terms specifically mentioned.

Such a broad reading of "similar tactics" would also go well beyond the type of conduct that the exclusion's specific language is meant to target. The exclusion mentions the use of another's name or product in an email address, domain name, or metatag. Using a term in a metatag or domain name can be a way to attempt to attract people searching for that term via a search engine.[9] Thus, using someone else's name or product in a metatag or domain name might be an attempt to divert their customers to a different website. Using another's name or product in an email address raises similar concerns about implying a false affiliation.

Sanderson's unauthorized use of St. Luke's website content, standing alone, does not implicate these same concerns. Indeed, his website did not even mention St. Luke's. We will not read the "similar tactics" language as sweeping into the exclusion a broad range of conduct that does not implicate the same concerns as

---

[9]  Metatags are words and phrases that describe a website's content. The metatags do not show up on the website itself, only in the source code. The web designer can include whatever metatags he desires. Many search engines use metatags as one way to determine the content of a website. Thus, for example, if you designed a website to advertise your electronics store, you might include keyword metatags such as "computers," "cameras," and "televisions," and a content metatag such as "We sell electronics at the best prices." If, however, you wanted to attract customers searching for better known electronics stores by name, you might also include metatags such as "Best Buy" and "Circuit City."

the tactics specifically mentioned.

The Insurance Companies drafted the exclusion using restrictive language directed at a particular set of concerns that are not implicated by the use of another's copyrighted content on a website.  If they had intended the exclusion to apply to any unauthorized use on the internet, they could have drafted the exclusion to say so.  *Cf. Berkshire Life Ins. Co. v. Adelberg*, 698 So. 2d 828, 830 (Fla. 1997) ("If this was [the insurance company's] intent, the company should have so stated in unambiguous language."); *Davis v. Nationwide Life Ins. Co.*, 450 So. 2d 549, 550 (Fla. 5th DCA 1984) ("If an insurer intends to restrict coverage, it should use language clearly stating its purpose.").  We should not read the exclusion's "similar tactics" language to expand a list of three specific, narrow uses to the point where any unauthorized use on a website is excluded from coverage.[10]

In sum, the copyright infringement claim against Sanderson does not itself constitute the "unauthorized use of another's name or product in [an] e-mail address, domain name or metatag, or any other similar tactic to mislead another's

---

[10]  Our narrow  reading of this exclusion is consistent with Florida law's directive that we apply *ejusdem generis* to such provisions.  We stress that our decision is based upon the "plain language of the policy," *see Fayad*, 899 So. 2d at 1086, as clarified through ordinary rules of contract construction, and not on the rule that ambiguous exclusionary provisions must be construed in favor of the insured.

potential customers."

2.    *Whether St. Luke's copyright infringement claim arises out of Sanderson's unauthorized use of the LASERSPECIALIST.com domain name*?

If the copyright claims are not excluded as the unauthorized use of St. Luke's name or product in an e-mail address, domain name or metatag or other similar tactic to mislead, they can only be excluded from coverage if they *arise out of* such use.

No Florida court has construed "arising out of" in the context of this particular exclusion.  However, the Florida Supreme Court has provided some guidance on the meaning of "arising out of" in insurance policies.  In *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.,* 913 So. 2d 528 (Fla. 2005), the Florida Supreme Court held that the phrase "arising out of" in policy exclusions is unambiguous and should be interpreted broadly.  The court explained:

> The term "arising out of" is broader in meaning than the term "caused by" and means "originating from," "having its origin in," "growing out of," "flowing from," "incident to" or "having a connection with."

*Id.* at 539 (internal quotation marks and citations omitted).

Nonetheless, the Florida Supreme court affirmed that the term "requires more than a mere coincidence between the conduct . . . and the injury.  It requires some causal connection, or relationship.  But it does not require proximate cause."

14

*Id.* at 539-40.

In this case, we cannot say that Sanderson's use of St. Luke's website content "flows from" or "grows out of" his use of St. Luke's domain name. Rather, Sanderson's use of the website content merely coincided with his use of the LASERSPECIALIST.com domain name. Sanderson could have committed either of these thefts without committing the other. That is, he could have taken the LASERSPECIALIST.com website content and put it up at SandersonEyes.com, or he could have used LASERSPECIALIST.com as the domain name for a website with completely new content describing his solo practice.[11] There is no *causal* connection between Sanderson's use of St. Luke's domain name and his posting of its website content on his website.

---

[11] The Insurance Companies assert that Sanderson used St. Luke's website content in an attempt to mislead St. Luke's potential customers. This may be true, but it is not relevant to the applicability of the unauthorized use exclusion. As discussed above, the exclusion for misleading another's customers extends only to conduct similar to the use of another's name or product in an email address, domain name or metatag. Sanderson's use of St. Luke's website content is not similar to his use of their domain name.

Nor is it enough to say that the copyright infringement was "part of a coordinated and comprehensive scheme to mislead and misdirect St. Luke's potential customers." The unauthorized use exclusion applies only to copyright violations if they "arise out of" an unauthorized use. The Insurance Companies repeated assertions that the copyright infringement was part of an overall scheme to mislead do not demonstrate the causal connection required for "arising out of." The copyright infringement must itself constitute a tactic similar to using a name or product in an email address, domain name, or metatag, or it must be "caused" by the use of such a tactic. *See Amco Ins. Co. v. Lauren-Spencer, Inc.*, 500 F. Supp. 2d 721 (S.D. Ohio 2007) (policy language targets misleading email addresses, domain names or metatags, used to obscure identity and draw customer traffic).

The Insurance Companies assert that the copyright infringement clearly arose out of Sanderson's theft and use of St. Luke's domain name, as this was a mechanism which guided St. Luke's customers to view the copyrighted materials. But the fact that using St. Luke's domain name made the copyright infringement more effective does not demonstrate that the copyright infringement was "caused" by the domain name theft.  It would be just as reasonable to say that the domain name theft arose out of the copyright infringement, in that Sanderson's theft of the website content led him to also steal the domain name to ensure more traffic for his website.  That the domain name directed internet traffic to Sanderson's pilfered web site does not mean that the infringing web site *content* was "caused" by clicking on the domain name, only that the *website* was located in this way.  The content, placed on the website prior to such clicking, constituted a copyright violation upon the posting, not the clicking.

Neither the district court nor the Insurance Companies point to any causal connection between Sanderson's copyright infringement and his use of St. Luke's domain name as required by Florida law.  St. Luke's copyright claim <u>may</u> be related to – but <u>it</u> does not arise out of –  Sanderson's use of the LASERSPECIALIST.com domain name.

The district court's application of the unauthorized use exclusion to the

copyright infringement claim in this case permits a narrow exclusion to swallow the clear coverage provisions for copyright and website claims. We will not rewrite the policies in this way. The Insurance Companies wrote the policies. Had they wanted such a broad exclusion, they could have drafted one. But the language of this exclusion as written requires some causal connection between the copyright infringement and the unauthorized use of the domain name, which is lacking here.

**2.     The DMCA Claim**

For reasons similar to those already discussed with respect to the copyright claim, the district court erred when it held that St. Luke's DMCA claim against Sanderson was excluded from coverage under the unauthorized use exclusion. The DMCA violation does not itself constitute either (i) unauthorized use of another's name or product in an email address, domain name or metatag, or (ii) a similar tactic to mislead another's customers. Nor can it be said to arise out of such conduct.

First, the DMCA claim arises out of Sanderson's removal of St. Luke's copyright notice from the LASERSPECIALIST.com website. The removal of another's copyright notice from a website clearly does not entail "the unauthorized use of another's name or product in [an] e-mail address, domain name or metatag."

17

Nor can the DMCA claim constitute a "similar tactic[]" within the meaning of the unauthorized use exclusion for the same reasons discussed in connection with the copyright claim.  It cannot fairly be said that removing another's name from a website is similar to using another's name in an email address, domain name, or metatag.  Such a reading would allow "similar tactics" to swallow the otherwise narrow language used in the unauthorized use provision.

Thus, as with the copyright claim, the DMCA violation is not excluded from coverage unless it 'arises out of' Sanderson's use of the LASERSPECIALIST.com domain name.  And, just as with the copyright infringement claim, the requisite causal connection is lacking.  Removing a copyright notice from a website cannot be said to "flow from" or "grow out of" using another's domain name.  The two acts are coincidentally, not causally, related.[12]

---

[12]  The Insurance Companies assert that the DMCA violation, like the copyright violation, was "inextricably intertwined" with the cyberpiracy and trademark infringement claims, and was "done for the purpose of misleading potential customers and arose out of the same scheme to promote Sanderson's competing practice."  Even if this were true, it is not enough to establish that the DMCA violation "arose out of" the properly excluded claims, for the reasons discussed above.   The fact that Sanderson's DMCA violation may have been related in some way to his use of St. Luke's domain name does not establish the necessary causal connection to conclude that the DMCA claim "aris[es] out of the unauthorized use of another's name or product in [an] e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers."  In sum, the plain language of the unauthorized use exclusion does not contemplate the DMCA claim against Sanderson.

18

III.

The district court's order granting summary judgment to the Insurance

Companies is

REVERSED. The case is REMANDED.

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

John Ley
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

February 07, 2013

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  11-11050-EE
Case Style:  St. Luke's Cataract and Laser v. Zurich American Insurance Comp, et al
District Court Docket No:  8:09-cv-01755-SDM-AEP

Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the CRIMINAL JUSTICE ACT must file a CJA voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for a writ of certiorari (whichever is later).

Pursuant to Fed.R.App.P. 39, costs taxed against the appellees.

The Bill of Costs form is available on the internet at www.ca11.uscourts.gov

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Lois Tunstall, EE at (404) 335-6224.

Sincerely,

JOHN LEY, Clerk of Court

Reply to:  Djuanna Clark
Phone #:  404-335-6161

OPIN-1A Issuance of Opinion With Costs